Joseph M. WINTERS, Plaintiff,

v.

**UNUM LIFE INSURANCE COMPANY OF AMERICA, Defendant.**

No. 01–C–0569–C.

United States District Court,
W.D. Wisconsin.

July 16, 2002.

Steven C. Underwood, Madison, WI, for Plaintiff.

John Harper, III, Krass Monroe, P.A., Minneapolis, MN, for Defendant.

## OPINION AND ORDER

CRABB, Chief Judge.

In this civil action for monetary relief, plaintiff Joseph M. Winters contends that defendant UNUM Life Insurance Company of America denied him benefits in violation of the terms of his employer-provided, group long-term disability insurance. Plaintiff filed this action in state court. Defendant removed it from that court because plaintiff's allegations fall under the Employee Retirement Income Security Act of 1974, 29 U.S.C. §§ 1001–1461, which preempts state law. Jurisdiction is present under 28 U.S.C. § 1331.

Presently before the court are the following motions: (1) plaintiff's motion for partial reconsideration of the court's order limiting the scope of discovery to the administrative record; (2) defendant's motion to dismiss plaintiff's breach of contract claim as preempted by ERISA; (3) defendant's motion for summary judgment; and (4) plaintiff's cross-motion for summary judgment.

█ Before I set out the undisputed facts and address the merits of defendant's motion for summary judgment, I will address the three other motions before the court. First, in plaintiff's motion for partial reconsideration of this court's order limiting discovery to the administrative record, he cites facts in the administrative record indicating that his job required traveling by car and plane, walking long distances and climbing up and down stairs. Plaintiff argues that such evidence shows that defendant did not genuinely evaluate whether plaintiff could perform his regular occupation and, thus, that it is necessary to expand the scope of discovery beyond the administrative record. In support of his contention, plaintiff cites *Perlman v. Swiss Bank Corporation Comprehensive Disability Protection Plan*, 195 F.3d 975, 982 (7th Cir.1999) (en banc), for the proposition that "when there can be no doubt that the application was given a genuine evaluation, judicial review is limited to the evidence submitted in support of the application for

benefits." However, the court in *Perlman* noted that "discovery may be appropriate to investigate a claim that the plan's administrator did not do what it said it did—that, for example, the application was thrown in the trash rather than evaluated on the merits." *Id.* In this case, plaintiff has made no such allegations. Plaintiff's argument is misplaced; it does not demonstrate the need to expand discovery, but rather is more appropriately an argument that the denial of disability benefits was arbitrary and capricious. Accordingly, plaintiff's motion for partial reconsideration will be denied.

■ Second, with respect to defendant's motion to dismiss plaintiff's breach of contract claim as preempted by ERISA, 29 U.S.C. § 1144, plaintiff's entire argument in response (which is found solely in a letter of correction attached to his revised brief in opposition) is "please see *Bartholet v. Reishauer A.G.*, 953 F.2d 1073, 1078 (7th Cir.1992). *Bartholet* says no." *See* Plt.'s Resp., dkt. # 33, attached letter. In *Bartholet,* the plaintiff argued that he was not presenting a question regarding the interpretation of his pension plan, but was seeking to enforce a contract with his employer that was not an employee benefit plan under ERISA. *Id.* at 1076. In this case, plaintiff alleges in his complaint that the denial of benefits was in violation of the terms of his group long-term disability insurance provided through his employer. *See generally* Plt.'s Cpt., dkt # 5. Therefore, the facts in *Bartholet* are not applicable to this case. Moreover, the Court of Appeals for the Seventh Circuit has held explicitly that ERISA "preempts a state law claim if the claim requires the court to interpret or apply the terms of an employee benefit plan, which the Supreme Court has defined as 'benefits whose provision by nature requires an ongoing administrative program to meet the employer's obligation.'" *Collins v. Ralston Purina Co.*, 147 F.3d 592, 595 (7th Cir.1998) (quoting

*Fort Halifax Packing Co. v. Coyne*, 482 U.S. 1, 11, 107 S.Ct. 2211, 96 L.Ed.2d 1 (1987)). Therefore, defendant's motion to dismiss plaintiff's breach of contract claim will be granted because such a state law claim is preempted by ERISA.

■ Finally, defendant argues that plaintiff filed an untimely cross-motion for summary judgment and that it should be disregarded by the court. According to the pretrial conference order, dispositive motions were to be filed by May 15, 2002. *See* Pretrial Conf. Order dated Nov. 6, 2001, dkt. # 8, at 3. Nevertheless, plaintiff filed his cross-motion with his brief in response to defendant's motion for summary judgment nearly three weeks later, on June 3, 2002. (Plaintiff should be aware that his brief in response to defendant's motion for summary judgment also was untimely because it was due on May 31, not June 3.) Plaintiff acknowledges that May 15 was the deadline for filing dispositive motions, but argues that the trial date (September 16, 2002) is also a deadline for these motions and that if his cross-motion is disallowed, "defendant has the last say while [plaintiff] carries the burden of proof." Plt.'s Reply, dkt. # 39, at 1–2. The court does not accept dispositive motions on the day the trial commences. If plaintiff wanted to file his own motion for summary judgment, he had until May 15 to do so. Plaintiff (who is represented by counsel) offers no reason for his dilatory motion other than his confusion. Accordingly, plaintiff's cross-motion for summary judgment will be denied as untimely. (Although plaintiff proposes additional facts in support of his cross-motion, he could have proposed these facts as supplementing his response to defendant's proposed findings of fact. I will consider these additional facts as supplementing plaintiff's response to defendant's proposed findings of

fact and defendant's response to those facts.)

As to defendant's motion for summary judgment, because I find that it was arbitrary and capricious for defendant to conclude (1) that plaintiff showed no change in his medical condition from 1988 to 1999 and (2) that plaintiff's occupation ("Sales Representative, Motor Vehicles and Supplies") does not require walking long distances, I will deny its motion for summary judgment and will grant summary judgment in favor of plaintiff on the court's own motion. Because defendant failed to give a full and fair review regarding plaintiff's appeal as to its determination that he was not under the regular care of a doctor, I will remand that issue for further proceedings consistent with this opinion.

From the proposed findings of fact and the record, I find the following facts material and undisputed.

## UNDISPUTED FACTS

### A. *The Policy*

Defendant issued a group long-term disability policy to plaintiff's former employer (Guardian Industries Corporation) with an effective date of April 1, 1998. The policy provides that it is "governed by the laws of the governing jurisdiction and to the extent applicable by the Employee Retirement Income Security Act of 1974 (ERISA) and any amendments." The policy provides that "[w]hen making a benefit determination under the policy, [defendant] has discretionary authority to determine [plaintiff's] eligibility for benefits and to interpret the terms and provisions of the policy." The policy states further that:

You are disabled when [defendant] determines that:

— you are **limited** from performing the **material and substantial duties** of your regular job with [your employer] due to **sickness** or **injury**; and

— you have a 20% or more loss in your **indexed monthly earnings** due to the same sickness or injury; and

— during the elimination period, you are unable to perform any of the material and substantial duties of your **regular occupation**.

You will continue to receive payments beyond 12 months if you are also:

— working in any occupation and continue to have a 20% or more loss in your indexed monthly earnings due to your sickness or injury; or

— not working and, due to the same sickness or injury, are unable to perform the duties of any gainful occupation for which you are reasonably fitted by education, training or experience.

Under the policy, "regular occupation" means "the occupation you are routinely performing when your disability begins." The policy defines "material and substantial duties" are those duties "normally required for the performance of your regular occupation; and cannot be reasonably omitted or modified." The policy provides further that:

You must be continuously disabled through your **elimination period**. [Defendant] will treat your disability as continuous if your disability stops for 30 days or less during the elimination period. The days that you are not disabled will not count toward your elimination period.

The elimination period is 180 days and is defined further as "a period of continuous disability which must be satisfied before you are eligible to receive benefits from [defendant]."

Under the policy, the claimant must show, at his or her expense, the following:

— that you are under **regular care** of a **doctor**;

— the appropriate documentation of your monthly earnings;

— the date your disability began;

— the cause of your disability;

— the extent of your disability, including restrictions and limitations preventing you from performing your regular occupation; and

— the name and address of any **hospital or institution** where you received treatment, including all attending doctors.

Under the policy, "regular care" means that:

— you personally visit a doctor as frequently as is medically required, according to generally accepted medical standards, to effectively manage and treat your disabling condition(s); and

— you are receiving the most appropriate treatment and care which conforms with generally accepted medical standards, for your disabling condition(s) by a doctor whose speciality or experience is the most appropriate for your disabling condition(s), according to generally accepted medical standards.

The policy provides that defendant shall notify the applicant of a denial of benefits within 90 days of the filing of a claim and provide the following:

— the specific reason or reasons for denial with reference to those policy provisions on which the denial is based;

— a description of any additional material or information necessary to complete the claim and of why that material or information is necessary; and

— the steps to be taken if you or your beneficiary wish to have the decision reviewed.

Please note that if [defendant] does not respond to your claim within the time limits set forth above, you should automatically assume that your claim has been denied and you should begin the appeal process at that time.

The policy states that an applicant has 60 days in which to appeal a denial of his or her benefits.

### B. *Application for Benefits*

On April 2, 1999, plaintiff worked for the last time for his employer after 27 years of service. On or about October 1, 1999, plaintiff submitted an application for long-term disability benefits with defendant. In his application, plaintiff stated that he began noticing weakness in his left leg in 1988 and, as of April 2, 1999, this problem prevented him from working full-time. In conjunction with his application, plaintiff submitted statements from his treating neurologists, Drs. Marian Sowa and Robert W. Graebner. Graebner examined plaintiff in 1988 and both neurologists examined him in 1999.

On April 2, 1999, Sowa examined plaintiff and diagnosed him with post polio syndrome with symptoms first manifesting in 1988. Sowa stated that plaintiff: (1) had "weakness (3+/5) hip flexors, extensors, foot dorsiflexors on L(leg) side"; (2) was restricted and limited from "walking long distance, climbing, going down stairs"; (3) had a "poor" prognosis for recovery; (4) had achieved maximum medical improvement; and (5) his left leg was expected to continue to deteriorate slowly. Sowa's clinical notes of her examination of plaintiff state in part:

Approximately 15 years ago, at the age of 50, [plaintiff] noticed a gradual worsening of his left leg strength. He was running approximately three miles a day at that time. Approximately 11 years ago, he came to Dean Medical Center and was seen by Dr. Graebner who performed an EMG which showed residual of polio as well as a polyneuropathy (EMG was done June 6, 1988). The patient states that the weakness is still progressing, and he is even weaker now than he was 11 years ago. He has

particular difficulty walking down stairs and will often walk down stairs facing the wrong way, holding on to the banister.

[Plaintiff] is currently working full-time now and travels but has a great deal of difficulty walking long distances, particularly in airports. He has also fallen approximately 50 times within the last few years. He does not have a supportive brace. It is unclear if he was ever really evaluated by physical rehabilitation.

\*    \*    \*    \*    \*    \*

PHYSICAL EXAMINATION ... There was no weakness detected in his arms or right leg. Strength testing of his left leg, however, revealed weakness of hip flexors and extensors 4–out of 5 on the left. He also had three out of five weakness of his quadriceps as well as his foot dorsiflexors.... There was also asymmetry noted of his calves. Calf was measured 10 cm. below the lower border of the patella on both sides. The right calf measured 38 cm. in circumference and the left was 35 cm. in circumference. Also noted were some fasciculations in his left calf and left thigh. The patient had not noticed these in the past. Reflexes were absent in his arms and legs. Toes were mute to plantar stimulation. He was able to feel pin, light touch, and vibration. He was able to toe walk but unable to heel walk on the left. He had great difficulty with tandem gait. He swayed with Romberg with his feet together and his legs closed.

On April 26, 1999, Sowa stated in her clinical notes regarding plaintiff's follow-up visit that "I do not feel, given [plaintiff's] job, that he can return to work." Sowa noted that plaintiff identified himself as a "traveling salesman."

In plaintiff's 1988 examination, Graebner (1) noted that plaintiff was jogging two to three miles a day; (2) noted no leg fasciculation; (3) noted that reflexes were absent in plaintiff's legs only; (4) made no notation regarding tandem gait difficulty; (5) made no notation regarding swaying "with Romberg"; and (6) made no notation of hip extensor weakness.

On May 5, 1999, plaintiff's employer provided defendant with a document stating that plaintiff stopped working because of "weakness in left leg/can walk limited distances only" and listed plaintiff's job as "Outside Sales Representative." On May 10, 1999, plaintiff's employer reported to defendant that:

As a salesman, [plaintiff] is in and out of his car all the time, carrying luggage through airports, up and down stairs in customers' offices, etc. A salesman sometimes stands, sometimes sits. It is difficult to quantify the actions as you could for a laborer.

In response to plaintiff's application for benefits, defendant conducted an investigation. On October 18, 1999, defendant interviewed plaintiff by telephone in order to gather additional information. During that interview, defendant documented plaintiff's occupation as encompassing extensive travel, carrying suitcases and spending a lot of time in airports.

On October 20, 1999, defendant conducted an in-house medical review. Defendant's reviewer (Yvonne Lewis, L.P.N.) concluded that "we need to see what the baseline function was and how he has declined." Defendant's reviewer stated that they needed to ascertain "who else has he seen him over the past two years for these complaints" and that they were "looking for support for his progressing decline."

On October 25, 1999, defendant requested additional information from Graebner. Upon receiving the information, defendant discovered that on April 13, 1999, Graebner performed an EMG that

"showed evidence of a polyneuropathy, chronic denervative changes consistent with polio residual, and no significant change from the study of 1988."

On November 16, 1999, defendant conducted another in-house medical review of plaintiff's claim. Defendant's reviewer (Sharon Davenport, R.N.) concluded that "EMG's done 1988 and 1999 both performed by Dr. Graebner—showing chronic denervative changes c/w polio residual and polyneuropathy. Dr. Sowa indicating no significant change between the two exams.... Suggest roundtable to discuss file direction."

On November 17, 1999, five of defendant's employees held a "roundtable" discussion. Tammy Berube, defendant's disability benefits specialist and one of those participating in the discussion, wrote the report from that meeting. (It is unclear whether any of the five persons at the meeting had medical training.) The report stated that "[i]n reviewing file documentation, medical info in the file does not support what changed in [plaintiff's] condition since onset in 1988 to LDW in 1999. Only notes available to review are from April of '99 that conclude no changes in EMG status from 1988–1999 results." The report concluded that "benefits are being denied based on [plaintiff] not meeting the elimination period/definition of disability. The medical documentation in our file does not support what changed in [plaintiff's] condition in 4/99 that prevented him from performing his occupation."

On November 17, 1999, defendant notified plaintiff in writing that his application for benefits had been denied because "Dr. Sowa indicates there is no significant change from your 1988 EMG and 1999 EMG results. There is no difference between the physical exam performed in May 1988 and April 1999 except for your calf measurements which may be due to a weight increase. At this time, the medical documentation does not support what changed in your condition to preclude work capacity in your own occupation." Defendant denied plaintiff's application on the basis of the two in-house medical reviews, the roundtable discussion and plaintiff's medical records. In its denial letter, defendant informed plaintiff that he had 60 days to submit additional information to support his request for benefits.

On December 3, 1999, plaintiff's counsel appealed defendant's denial of plaintiff's application for benefits and stated that he would be gathering medical information and would forward it to defendant as soon as possible.

On January 19, 2000, plaintiff's counsel sent a letter to defendant stating that "Dr. Graebner advised [plaintiff] that the EMG is not a definitive test of muscle strength or weakness. It is only one test, and it is a test of nerve reaction." The letter stated that all of plaintiff's medical records had been provided to defendant.

On January 25, 2000, defendant determined that the "newly submitted medical data provides no new information which is pertinent to his post-polio syndrome. The last available treatment addressing this condition is 4/26/99."

On February 9, 2000, defendant denied plaintiff's appeal. In its denial letter, defendant stated in part that:

Dr. Sowa submitted an Attending Physician Statement, dated April 2, 1999, which provided restrictions and limitations of unable to walk long distance, climb or go down stairs. According to the Dictionary of Occupational Titles, [plaintiff's] occupation is listed as Sales Representative, Motor Vehicles and Supplies. According to the DOT, this occupation does not require walking long distances, climbing or going down stairs. As such, [plaintiff] would not be precluded from performing the material and

substantial duties of his occupation throughout the elimination period, as required by the definition of disability outlined above.

In addition, it is unclear what changed in [plaintiff's] condition to preclude work capacity in his own occupation as of April 3, 1999. Our medical department has reviewed the medical documentation in [plaintiff's] file. As stated in our letter of November 17, 1999, in regard to the EMG's [sic] of 1988 and 1999, Dr. Sowa stated there was "no significant change from the study of 1988."

[Plaintiff's] policy requires that he provide us with proof of claim, which must show, amongst other things, that he is under the regular care of a doctor. The definition of regular care is provided above for your reference. The medical information in [plaintiff's] file does not address treatment for post polio syndrome beyond the April 26, 1999 office visit; a visit which is summarized as a follow-up from the EMG of April 13, 1999. As such, there is no documentation that [plaintiff] was under the regular care of a doctor, for the condition causing his claimed disability, throughout the elimination period. We note that [plaintiff's] letter of January 19, 2000 indicates that all of [his] medical records have already been provided to [defendant].

The restrictions and limitations that Dr. Sowa provided would not preclude [plaintiff] from performing the material and substantial duties of his regular occupation during the elimination period.... [W]e have determined that the decision to deny benefits on [plaintiff's] claim for Long Term Disability benefits was contractually supported and will be upheld.

Your letter of January 19, 2000 mentions recent contact between [plaintiff] and Dr. Graebner of which we have no record. Should you wish to submit additional information regarding this matter, we will review it, if our company receives it within 60 days of the date of this letter.

On May 5, 2000, plaintiff's counsel sent defendant a letter refuting its three reasons for denial as well as its interpretation of the Dictionary of Occupational Titles. The letter stated that Graebner had seen plaintiff on April 24, 2000, that Graebner would forward a report to defendant as soon as it was completed and that "[r]egular care is being provided to [plaintiff] based on his diagnosis." Plaintiff's counsel concluded that "[i]t would seem we may be at an impasse on this issue and we would respectfully request an alternative dispute resolution and the use of a mediator or arbitrator should you continue to deny [plaintiff's] claim."

On May 14, 2000, defendant acknowledged plaintiff's recent request for an additional review of his long-term disability claim. (It appears defendant construed plaintiff's May 5 letter as a request for review.)

On June 6, 2000, Graebner sent plaintiff a letter stating that he was "disabled for all but light duty part-time work" and suggested that "it might be worth doing some additional testing regarding [plaintiff's] polyneuropathy condition which is independent of [his] post polio problem, though the results of these two disorders can be additive." Plaintiff forwarded a copy of this letter to defendant.

On July 6, 2000, defendant performed a third in-house medical review. Defendant's reviewer (a physician) concluded that:

Dr. Graebner's letter does not provide sufficient support medically to explain the insured's loss of functional capacity as of 4/3/99. In fact, it is clear that Dr. Graebner has not yet identified the cause of the insured's self-reported wor-

sening of his functional capacity. All objective tests in 4/99 appeared to substantiate the insured has not changed significantly from a physical point of view from 1988 to 1999, except for sexual function.

On July 10, 2000, defendant upheld its earlier decision to deny plaintiff long-term disability benefits. Defendant stated that its position remained the same as set forth in the February 9, 2000 denial letter: no disability benefits were payable because (1) there was no medical documentation to support a change in functional capacity as of April 3, 1999; (2) there was no documentation to support that plaintiff was under the regular care of a doctor throughout the elimination period; and (3) the restrictions and limitations would not preclude plaintiff from performing the material and substantial duties of his regular occupation during the elimination period.

## OPINION

■ The parties do not dispute that plaintiff's policy for group long-term disability benefits grants the plan administrator sufficient discretionary authority to invoke an arbitrary and capricious standard of review. *See Firestone Rubber v. Bruch,* 489 U.S. 101, 115, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989) (denial of benefits must be reviewed *de novo* unless "the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan"); *see also Herzberger v. Standard Insurance Co.,* 205 F.3d 327, 331 (7th Cir.2000). The plan states that "[w]hen making a benefit determination under the policy, [defendant] has discretionary authority to determine [the insured's] eligibility for benefits and to interpret the terms and provisions of the policy." Because the language of the policy makes it clear that the administrator is to exercise discretion, defendant's decision to deny benefits will be reviewed under the arbi-

trary and capricious standard. Under this standard, the Court of Appeals for the Seventh Circuit limits the scope of review to the record available to the plan administrator at the time the decision was made. *See, e.g., Donato v. Metropolitan Life Insurance Co.,* 19 F.3d 375, 380 (7th Cir. 1994); *Smart v. State Farm Ins. Co.,* 868 F.2d 929, 936 (7th Cir.1989).

■ A decision is arbitrary or capricious only when the decision maker "has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence ... or is so implausible that it could not be ascribed to difference in view or the product of ... expertise." *Pokratz v. Jones Dairy Farm,* 771 F.2d 206, 209 (7th Cir.1985) (citing *Motor Vehicle Manufacturers Ass'n v. State Farm Mutual Auto. Ins. Co.,* 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983)). "The arbitrary and capricious standard does not require the committee's decision to be the only sensible interpretation of a plan, so long as its decision 'offer[s] a reasoned explanation, based on the evidence, for a particular outcome.'" *Krawczyk v. Harnischfeger Corp.,* 41 F.3d 276, 279–80 (7th Cir.1996) (quoting *Pokratz,* 771 F.2d at 209). Under this standard of review, a court should consider the following factors: "the impartiality of the decisionmaking body, the complexity of the issues, the process afforded the parties, the extent to which the decisionmakers utilized the assistance of experts where necessary, and finally the soundness of the fiduciary's ratiocination." *Chalmers v. Quaker Oats Co.,* 61 F.3d 1340, 1344 (7th Cir.1995).

1. *Reason for denial: November 17 letter*

■ On November 17, 1999, defendant informed plaintiff that it was denying ben-

efits because "Dr. Sowa indicates there is no significant change from your 1988 EMG and 1999 EMG results" and that "[t]here is no difference between the physical exam performed in May 1988 and April 1999 except for your calf measurements which may be due to weight increase." In this letter, defendant informed plaintiff that he had 60 days to appeal or its decision would be final. On December 3, 1999, plaintiff appealed. On February 9, 2000, the appeal was denied. I find that a lack of change between 1988 and 1999 as a basis for denying plaintiff's application for benefits is arbitrary and capricious. First, the policy does not require plaintiff to prove a change in condition, it requires him to prove that he is disabled. In April 1999, Sowa concluded that plaintiff (1) had "weakness (3+/5) hip flexors, extensors, foot dorsiflexors on L(leg) side"; (2) was restricted and limited from "walking long distance, climbing, going down stairs"; (3) had a "poor" prognosis for recovery; (4) had achieved maximum medical improvement; (5) that plaintiff's left leg would continue to deteriorate slowly; and (6) on the basis of plaintiff's occupation as a traveling salesman, he could not return to work. In 2000, Graebner concluded that plaintiff was disabled for all but light duty, part-time work. Defendant provides no medical opinions refuting Sowa's and Graebner's conclusions as to plaintiff's disability as of April 1999.

Second, even if plaintiff were required to prove a change in his medical condition, he has done so. Defendant focused solely on Graebner's comment that plaintiff's 1999 EMG showed no significant change from his 1988 EMG to conclude that no physical change had occurred other than increase in calf measurements. (EMG is an acronym for an electromyogram, which is a "graphic representation of the electric currents associated with muscle action." *Stedman's Medical Dictionary* 576 (27th ed.2000).) However, Graebner also noted

that plaintiff's 1999 EMG "showed evidence of polyneuropathy [and] chronic denervative changes consistent with polio residual." Moreover, defendant's November 17 denial letter concludes that the only change in plaintiff physical condition between 1988 and 1999 were his calf measurements, which defendant surmised "may be due to weight increase." (It is unclear why defendant concluded that plaintiff's *asymetric* calf measurements (right calf 38 cm and left 35 cm) might be caused by weight gain.) However, this no-change determination belies the 1988 and 1999 medical reports. In fact, in plaintiff's additional proposed findings of fact, he points out differences evident in the administrative record between Graebner's 1988 exam and Sowa's 1999 exam. Interestingly and somewhat confusingly, defendant disputed plaintiff's effort to highlight these differences in his proposed findings of fact by arguing that:

> There is no support in the administrative record that Dr. Graebner was looking for or diagnosed the same symptoms, made the same assessments, asked the same questions, conducted the same medical tests, or even elected to record the same medical information in 1988 as Dr. Sowa did in 1999. Therefore, a comparison between these two reports cannot establish a change in [p]laintiff's medical condition.

*See* Dft.'s Rebuttal Proposed Findings of Fact, dkt. # 36, at 2. However, defendant itself contrasted these same two medical reports and concluded that there was no change in plaintiff's condition other than increased calf measurements and, as a result, denied plaintiff benefits. In other words, defendant argues that plaintiff cannot rely upon the same two medical reports to conclude change in condition that defendant relied upon in concluding that there was no change in condition. Defendant's posture is untenable.

In any event, the differences between the two medical reports are apparent. It is undisputed that Graebner (in 1988) and Sowa (in 1999) each examined plaintiff for post-polio syndrome. At plaintiff's 1988 examination, Graebner (1) noted that plaintiff reported he was jogging two to three miles a day; (2) noted no leg fasciculation (fasciculation is defined as "involuntary contractions, or twitchings, of groups of muscle fibers." *Stedman's* at 650.); (3) noted that reflexes were absent in legs only; (4) made no notation regarding tandem gait difficulty; (5) made no notation regarding swaying with Romberg (in the so-called Romberg test, the subject stands with feet approximated "with eyes open and then closed; if closing the eyes increases the unsteadiness, a loss of proprioceptive control is indicated." *Id.* at 1640.); and (6) made no notation of hip extensor weakness. In contrast, in plaintiff's 1999 examination, Sowa (1) noted that plaintiff reported that he had fallen approximately 50 times in the last few years and often walks down stairs facing the wrong direction while holding the banister because of difficulty walking; (2) noted fasciculation in the left calf and thigh; (3) noted that reflexes were absent in legs and arms; (4) noted "great difficulty" with tandem gait; (5) noted swaying with Romberg with feet together and eyes closed; and (6) noted that "weakness (3+/5) hip flexors, extensors, foot dorsiflexors on L(leg) side." As is clear from a side-by-side comparison, the medical reports in the administrative record show that plaintiff's condition had changed in several ways in addition to calf measurements. (In addition, defendant's third in-house medical review acknowledges a change in sexual function from 1988 to 1999.) Therefore, defendant's conclusion in its November 17 letter that there is no difference between the 1988 and 1999 physical exams and that "the medical documentation does not support what changed in your condition" is an arbi-

trary and capricious determination. Thus, defendant's motion for summary judgment as to this issue will be denied. Although plaintiff failed to file his motion for summary judgment in a timely manner, I will enter summary judgment for plaintiff on this issue on the court's own motion, as is permitted where the record reveals that the non-moving party is entitled to judgment. *Borcherding–Dittloff v. Corporate Receivables, Inc.,* 59 F.Supp.2d 822, 826 (W.D.Wis.1999); *see also* 10A Wright, Miller & Kane, *Federal Practice and Procedure* 3d § 2720 at 347 (1998) (summary judgment may be entered in favor of non-moving party even though no formal cross-motion has been filed).

### 2. *Reasons for denial: February 9 letter*

On February 9, 2000, defendant denied plaintiff's appeal. However, in addition to affirming its original reason for denial (no change in medical condition between 1988 and 1999), defendant informed plaintiff of two additional reasons for denying benefits: (1) plaintiff's occupation ("Sales Representative, Motor Vehicles and Supplies") does not require walking long distances, climbing or going downstairs and, as such, plaintiff would not be precluded from performing the material and substantial duties of his occupation through the elimination period and (2) plaintiff's file did not indicate that he was under the regular care of a doctor beyond April 26, 1999, as required under the policy. These two new reasons for denial were not prompted by any additional information that plaintiff provided. In fact, it is unclear why defendant did not include these two reasons in its original, November 17 denial letter. In any event, defendant concluded the letter by informing plaintiff that he had 60 days to provide additional information for defendant's review. In other words, defendant treated the February 9 denial letter as an original

rejection letter when it notified plaintiff of his right to appeal within 60 days and offered to review any additional information.

Plaintiff argues that defendant abused its discretion by proffering two new reasons to deny plaintiff benefits in its February 9 letter because these two reasons fall outside the 90–day time limit. Under the terms of the policy, defendant had 90 days to provide plaintiff with a notice of denial which "shall include the specific reason or reasons for the denial." Defendant ignores plaintiff's argument and instead argues the merits of each reason for denial. Plaintiff applied for benefits on or about October 1, 1999. Therefore, defendant had until approximately January 1, 2000, to state the specific reasons for denying plaintiff's claim. It is undisputed that the long-term disability policy at issue in this case is governed by ERISA, which states that such an employee benefit plan shall:

> (1) provide adequate notice in writing to any participant or beneficiary whose claim for benefits under the plan has been denied, setting forth the specific reasons for such denial, written in a manner calculated to be understood by the participant, and

> (2) afford a reasonable opportunity to any participant whose claim for benefits has been denied for a full and fair review by the appropriate named fiduciary of the decision denying the claim.

29 U.S.C. § 1133. In this case, the policy parrots the time limitations imposed under ERISA, namely, defendant had 90 days to notify plaintiff of its determination and plaintiff had 60 days to appeal. *See* 29 C.F.R. § 2560.503–1(f), (i). Typically, the February 9 letter would have ended the appeals process by either affirming or reversing the reason for denial set forth in the November 17 letter. However, presumably because the February 9 letter contained two additional reasons for the denial, defendant informed plaintiff that he had 60 days in which to submit additional information for review. In other words, defendant allowed plaintiff to appeal the appeals determination as well. Although providing two additional reasons outside the prescribed 90–day time frame does not technically comply with ERISA, I find that because defendant informed plaintiff of his opportunity to appeal the additional reasons, defendant nevertheless substantially complies with ERISA. *See Donato v. Metropolitan Life Ins. Co.*, 19 F.3d 375, 382 (7th Cir.1994) (substantial compliance with ERISA regulations is sometimes sufficient to overcome procedural defects); *Halpin v. W.W. Grainger, Inc.*, 962 F.2d 685, 693–94 (7th Cir.1992) (substantial compliance with ERISA regulations is sufficient, so long as notice given provides plan participant and courts sufficiently precise understanding of ground for denial to permit realistic opportunity for review). Moreover, plaintiff does not argue that he was prejudiced by the fact that defendant added two additional reasons for denial in the February 9 letter. Perhaps a better vantage point from which to examine defendant's procedural defect is to consider that defendant could have granted plaintiff's application for benefits and then attempted to terminate these benefits at a later date on the basis of the two additional reasons stated in the February 9 letter. Accordingly, the question becomes whether the two additional reasons proffered in the February 9 letter were arbitrary and capricious.

As stated above, in its February 9 letter, defendant denied plaintiff's benefits on two additional grounds: (1) plaintiff's occupation of "Sales Representative, Motor Vehicles and Supplies" does not require "walking long distances, climbing or going down stairs" and (2) the policy requires plaintiff to show that he is "under the regular care

of a doctor." I will address each reason in turn.

a. Plaintiff's occupation

■ According to defendant, it denied plaintiff benefits because his occupation, "Sales Representative, Motor Vehicles and Supplies," does not require "walking long distances, climbing or going down stairs." (These are the same three activities that Dr. Sowa concluded plaintiff was no longer capable of doing.) The Dictionary of Occupational Titles defines "Sales Representative, Motor Vehicles and Supplies" as:

> Sells motor vehicles, such as automobiles, motorcycles, tractors, and trucks, and parts and supplies, such as batteries, tires, motors, chassis parts, tools, equipment, and lubricants, to dealers and service stations: Confers with dealer and reviews sales records to determine number of vehicles to order. Advises customer in methods of increasing sales volume, utilizing knowledge of sales promotion techniques. *Performs other duties as described under SALES REPRESENTATIVE (retail trade; wholesale tr.) Master Title.* May be designated according to items sold as Sales Representative, Automobile Parts And Supplies (wholesale tr.).
> GOE: 08.02.01 STRENGTH: L GED: R4 M3 L4 SVP: 5 DLU: 77

*Dictionary of Occupational Titles* 273.357–022 (4th ed.1991) (emphasis added). The "Sales Representative Master Title" further defines plaintiff's occupational duties as:

> Sells products to business and industrial establishments or individual for manufacturer or distributor at sales office, store, showroom, or customer's place of business, utilizing knowledge of product sold: Compiles lists of prospective customers for use as sales leads, based on information from newspapers, business directories, and other sources. *Travels throughout assigned territory to call on regular and prospective customers to solicit orders or talks with customers on sales floor or by phone.* Displays or demonstrates product, using samples or catalog, and emphasizes salable features. Quotes prices and credit terms and prepares sales contracts for orders obtained. Estimates date of delivery to customer, based on knowledge of own firm's production and delivery schedules. Prepares reports of business transactions and keeps expense accounts.

*Id.* at Master Titles (emphasis added). In addition, "Sales Representative, Motor Vehicles and Supplies" is categorized as a "light work" occupation. *Id.* at 273.357–022 ("Strength: L"). "Light work" is defined in the Dictionary of Occupational Titles as:

> **L–Light Work**—Exerting up to 20 pounds of force occasionally, and/or up to 10 pounds of force frequently, and/or a negligible amount of force constantly (Constantly: activity or condition exists 2/3 or more of the time) to move objects. Physical demand requirements are in excess of those for Sedentary Work. Even though the weight lifted may be only a negligible amount, a job should be rated Light Work: (1) when it *requires walking or standing to a significant degree;* or (2) when it requires sitting most of the time but entails pushing and/or pulling of arm or leg controls; and/or (3) when the job requires working at a production rate pace entailing the constant pushing and/or pulling of materials even though the weight of those materials is negligible.

*Id.* at App. C (emphasis added). In addition, the Code of Federal Regulations states that in order to make "disability determinations" and "determine physical exertion requirements of work in the national economy," the following definition of

light work has the same meaning as light work in the Dictionary of Occupational Titles:

> Light work. Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, *a job is in this category when it requires a good deal of walking or standing,* or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

20 C.F.R. § 404.1567(b) (emphasis added). In sum, according to the definitions of light work found in the Dictionary of Occupation Titles and Code of Federal Regulations, which are considered synonyms, plaintiff's occupation "requires a good deal of walking" or "requires walking . . . to a significant degree." Moreover, plaintiff's occupation encompasses "[t]ravel[ ] throughout assigned territory to call on regular and prospective customers to solicit orders." In light of these occupational definitions, especially when factoring in the definition of "light work," I find that it is arbitrary and capricious for defendant to conclude that plaintiff's occupation, as performed in the national economy, "does not require walking long distances." Thus, defendant's motion for summary judgment will be denied as to this issue. Although plaintiff failed to file his motion for summary judgment in a timely manner, I will enter summary judgment for plaintiff on this issue on the court's own motion, as is permitted where the record reveals that the non-moving party is entitled to judgment. *Borcherding–Dittloff,* 59 F.Supp.2d at 826; *see also Federal Practice and Procedure* at 347.

**b. Regular care of a doctor**

■ According to the policy, "regular care" means that plaintiff must "personally visit a doctor as frequently as is medically required, according to generally accepted medical standards, to effectively manage and treat your disabling condition(s)." In its February 9, 2000 letter, defendant informed plaintiff for the first time that because he had not seen a physician since April 26, 1999, he was not "under the regular care of a doctor" and, as such, he was precluded from receiving benefits on this basis. However, this statement is a conclusion rather than a reason because it lacks an explanation of what constitutes "regular" care in light of plaintiff's medical condition. *See Wolfe v. J.C. Penney Co., Inc.,* 710 F.2d 388, 392 (7th Cir.1983); *Richardson v. Central States, Southeast and Southwest Areas Pension Fund,* 645 F.2d 660, 664 (8th Cir.1981); *see also* 29 C.F.R. 2560.503–1(g) (notification shall include "description of any additional material or information necessary for the claimant to perfect the claim."). On May 5, 2000, plaintiff informed defendant that "[r]egular care is being provided to [plaintiff] based on his diagnosis." Moreover, plaintiff argues that there is no treatment or cure for post polio syndrome and, thus, it is unnecessary to visit a doctor any more than he has done so already. In addition, plaintiff visited Graebner on April 24, 2000, a year after his previous medical visit on April 26, 1999. On May 5, 2000, plaintiff informed defendant of this fact and stated that Graebner's report would be forwarded as soon as it had been completed.

On July 6, 1999, defendant conducted an in-house review in response to plaintiff's objections to the three reasons for denial set forth in its February 9 letter. Howev-

er, the physician's notes regarding defendant's in-house review do not address or even mention lack of regular care of a doctor. On July 10, 2000, defendant reiterated lack of regular care as a reason for denial without offering any reasons why it concluded that plaintiff is not under the regular care of a doctor given his untreatable medical condition and his annual visits to a specialist. It does not appear from defendant's in-house review, that defendant addressed plaintiff's justifications for not seeing a doctor more often. To this extent, defendant failed to provide plaintiff with a full and fair review with respect to this reason for denial. The Court of Appeals for the Seventh Circuit has "interpreted the requirement of 'full and fair review' to mean that a benefit plan must provide claimants with access to 'the evidence the decisionmaker relied upon' in denying their claim.'" *Wilczynski v. Lumbermens Mutual Casualty Co.*, 93 F.3d 397, 402 (7th Cir.1996) (quoting *Brown v. Retirement Comm. of Briggs & Stratton Retirement Plan*, 797 F.2d 521, 534 (7th Cir.1986)); *see also* 29 C.F.R. § 2560.503–1(h) (no full and fair review of adverse benefit determination if it does not take into account all comments submitted by claimant). Accordingly, defendant's motion for summary judgment as to this issue will be denied and the case will be remanded to defendant to provide a full and fair review of the merits of plaintiff's appeal. Defendant may have until August 23, 2002, to conduct the full and fair review and report its findings to the court. Plaintiff may have until September 6, 2002, to advise the court whether he objects to the review process or defendant's benefit determination.

## ORDER

IT IS ORDERED that

1. Plaintiff Joseph M. Winters's motion for partial reconsideration of this court's order limiting the scope of discovery is DENIED;

2. Defendant UNUM Life Insurance Company of America's motion to dismiss plaintiff's breach of contract claim is GRANTED;

3. Plaintiff's cross-motion for summary judgment is DENIED as untimely;

4. Defendant's motion for summary judgment is DENIED.

5. On the court's own motion, summary judgment is GRANTED in plaintiff's favor on the reasons for denial that (a) there was no change in plaintiff's medical condition from 1988 to 1999 and (b) plaintiff's occupation "does not require walking long distances"; and

6. The issue whether plaintiff was denied benefits because he is allegedly not under the regular care of a doctor is REMANDED to defendant to provide a full and fair review of the merits of plaintiff's appeal; defendant may have until August 23, 2002, to conduct the full and fair review and report its findings to this court; plaintiff may have until September 6, 2002, in which to advise the court whether he objects to the review process or defendant's benefit determination.