Eric FRELING, M.D., Plaintiff,

v.

RELIANCE STANDARD LIFE
INSURANCE COMPANY,
Defendant.

No. 02–60852CIV.

United States District Court,
S.D. Florida,
Miami Division.

Feb. 24, 2004.

Craig Mitchell Greene, Kramer, Green, Zuckerman, Greene & Buchsbaum, Hollywood, FL, for plaintiff.

Joshua Bachrach, Rawle & Henderson, Philadelphia, PA, Gene D. Lipscher, Jupiter, FL, for defendant.

## *ORDER ON PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND DEFENDANT'S MOTION FOR SUMMARY JUDGMENT*

ALTONAGA, District Judge.

THIS CAUSE came before the Court upon Plaintiff, Eric Freling, M.D.'s (hereinafter "Dr. Freling") Motion for Summary Judgment (D.E.54); and Defendant, Reliance Standard Life Insurance Company's (hereinafter "Reliance") Motion for Summary Judgment. (D.E.56). Both parties request a summary judgment on the two-count complaint filed by Dr. Freling, which

seeks disability benefits and a declaratory judgment pursuant to an Employee Benefit Plan (hereinafter "Plan") governed by the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §§ 1001 *et seq.* Oral argument on the parties' respective Motions was held on November 26, 2003. The Court has given careful consideration to the Motions, argument by counsel, and pertinent portions of the record.

## I. *UNDISPUTED FACTS* [1]

On October 18, 2000, Dr. Freling had an accident at his home with a power circular saw resulting in the amputation of his left index finger and a lacerated left middle finger. Dr. Freling's accident also damaged the digital nerves of these fingers. Prior to the accident, Dr. Freling's employer, Tenet Healthcare ("Tenet"), had purchased a "Regular Occupation" disability insurance policy (the "Policy") for the benefit of Tenet's physician employees, including Dr. Freling. The Policy provides that Dr. Freling will be entitled to total disability benefits in the event he becomes totally disabled as defined by the Policy. Reliance acknowledges that it serves both as the insurer and the claim review fiduciary for the Policy.

### A. *The Policy*

The Policy provides in pertinent part:
"Totally Disabled" and "Total Disability" mean, that as a result of an Injury or Sickness:

(1) **during the Elimination Period** [2] an Insured cannot perform each and every

---

1. The parties agree that the material facts are not in dispute. This section is therefore comprised of facts cited in the parties' memoranda as well as the exhibits attached without objection. In particular, Defendant provided, without explanation, an exhibit that appears to be Plaintiff's claim file. The memoranda suggest that the claim file is part of the administrative record relied upon by Defendant when it made its determination to deny disability benefits to Dr. Freling. Defendant's exhibits are referenced in this order in the form: RSL # .

2. The Policy defines "Elimination Period" as "a period of consecutive days of Total Disability, as shown on the Schedule of Benefits page, for which no benefit is payable. It begins on the first day of Total Disability." (Policy at 2.0). The Schedule of Benefits

material duty of his/her regular occupation; and

(2) **for the first 24 months for which Monthly Benefit is payable,** an Insured cannot perform **the material duties** of **his/her regular occupation;**

(a) "Partially Disabled" and "Partial Disability" mean that as a result of an Injury or Sickness an Insured is capable of performing the material duties of his/her regular occupation on a part-time basis or some of the material duties on a full-time basis. An Insured who is Partially Disabled will be considered Totally Disabled, except during the Elimination Period;

(3) **after a Monthly Benefit has been paid for 24 months,** an Insured cannot perform **material duties** of **any occupation.** Any occupation is one that the Insured's education, training or experience will reasonably allow. We consider the Insured Totally Disabled if due to an Injury or Sickness he or she is capable of only performing the material duties on a part-time basis or part of the material duties on a Full-time basis.

(Policy at 2.1) (emphasis added). The Policy does not provide a definition for the terms "regular occupation" or "material duty." Dr. Freling sought benefits during the "Elimination Period" and thus Reliance applied the definition in subparagraph (1) above.

## B. *Plaintiff's Claim for Benefits*

Plaintiff was employed as an OB/GYN physician with Tenet from May 1, 1989 until October 17, 2000. Dr. Freling's pre-injury duties included "obstetrical and gynecological surgery including delivery of babies, pre and post operative surgical care and obstetric care; office care of patients including well visits (full exams, breast exams and pelvic exams and other necessary gynecological testing)." (Disability Claim Employee's Statement, attached as Pl.'s Ex. K).

On November 29, 2000, Dr. Freling filed a claim with Defendant stating that as a result of the October 18, 2000 accident, he was totally disabled under the Policy. Tenet was required to complete an employer section of Dr. Freling's claim form. In response to the question "What are the Major Tasks Requiring Use of One or Both hands?" Tenet responded: "surgery." Tenet was not required to list the duties of Dr. Freling's occupation on the claim form.

On December 29, 2000, Reliance requested from Tenet Dr. Freling's payroll statements from July 15, 2000 to October 15, 2000, copies of any notification sent by Tenet that its office was closing, and a copy of Dr. Freling's job description. (RSL 00085) A Telephone Conversation Record in the administrative record indicates that Carol Timlin, Senior Disability Examiner for Reliance, called Dr. Freling on December 29, 2000. (RSL 00082). Dr. Freling was explained the Policy terms and was asked what "he could do." (*Id.*). He responded that he could do "reports and things." (*Id.*).

On February 28, 2001, Ms. Timlin sent David Burke[3] a facsimile, and noted on the cover sheet that Plaintiff's employer's office was closing down. (RSL 00235). Ms. Timlin's notes further indicate that

states that the Elimination Period is 90 consecutive days of Total Disability. (Policy at 1.0).

**3.** The administrative record indicates that David Burke is employed by Disability Management Services, Inc. or by UNUM Provident, but there is no explanation regarding his involvement with Defendant's review of Dr. Freling's claim. (RSL 00216 & RSL 00241). The record suggests that Mr. Burke's involvement perhaps was related to Defendant's investigation of Dr. Freling's claim. (RSL 00241 & RSL 00253)

Reliance characterized Plaintiff's occupation as consisting of "60 [%] Ob, exams and 40 % surgery." (*Id.*). Thereafter, on March 2, 2001, Reliance received a faxed copy of Dr. Freling's employment agreement. (RSL 00195–213). An exhibit attached to the employment agreement detailed Dr. Freling's duties and responsibilities. (RSL 00205–6).

On Defendant's Medical/Vocational Review form completed by Carol Timlin [4] on March 7, 2001, Timlin noted that "[Dr. Freling] is right hand dominant. Must be able to finger and have touch sensation for exams. Based on review do you believe insured is unable to perform light duty based on records? Please review E + E definition during claim period 10/18/00 to 1/19/01." (RSL 00233). On the same form, the section that is to be completed by the "Medical Department" notes that Plaintiff's injury would "preclude clmt. from fine manipulation of the index [and] middle finger of the [left] hand." (*Id.*).

The record also reflects that an independent investigation of Plaintiff's claim was conducted by The International Institute of Forensic Science. (RSL 00092). A report dated April 23, 2001 contains notes of an interview of Dr. Freling conducted by an investigator. (RSL 00096). With respect to Plaintiff's regular occupational duties, the report notes that:

> The insured said he works an average of 65 hours + per week and estimates 80% of his hours are spent in obstetrical and gynecological surgery to include delivery of babies and pre & post operative surgical and obstetrical care. He estimates that the other 20% of his work hours are spent performing office care of patients

to include well visit care (full exams, breast exams, pelvic exams) and other gynecological testing procedures.

(RSL 00098). This investigator's report reveals a different breakdown of Plaintiff's occupation than that indicated in Timlin's earlier notes.

Thomas Hardy, Defendant's Senior Vocational Rehabilitation Coordinator, completed an undated report after reviewing two United States Department of Labor Dictionary of Occupational Titles ("DOT") definitions that Reliance had assigned to Plaintiff's file. (RSL 00185). The DOT identifies five (5) tasks for obstetricians and two (2) tasks for gynecologists. For gynecologists the tasks listed are: (1) examine patients to determine medical problem using physical findings, diagnostic images, lab tests and patient's statements; (2) discuss problems with patient and prescribe medication and exercise or hygiene regimen or perform surgery. (RSL 00186). The tasks for obstetrician are listed as: (1) examine patients to ascertain condition; (2) determine need for modified diet and physical activity and recommend plans; (3) periodically examine patient, prescribe medication or surgery; (4) deliver infants and care for mother following childbirth; (5) perform cesarean section or other surgery as needed. (RSL 00189).

Mr. Hardy noted that the vocational referral sheet indicated that Dr. Freling "suffered an amputation of the left index finger at the Pip joint," and that the injury was on the non dominant hand. (*Id.*) Mr. Hardy conducted his vocational review pursuant to the "each and every" language of the Policy. (*Id.*) His conclusions were as follows:

*Obstetrician 070.101–054*

---

4. The blank space for the Examiner's name on this form is initialed "CT," which matches the initials of Carol Timlin, the initial examiner of Dr. Preling's claim.

| | | |
|---|---|---|
| CAN PERFORM | 1. | Examination of patients, Diagnosis. |
| CAN PERFORM | 2. | Diet and physical exercise plans. |
| CAN PERFORM | 3. | Examination of patient, Medication or Surgery. |
| CANNOT PERFORM | 4. | *Deliver Infant, BUT CAN PERFORM care for mother post partum. |
| CANNOT PERFORM | 5. | Cesarean section or surgical procedures. |

*Gynecologist 070.101–054*

| | | |
|---|---|---|
| CAN PERFORM | 1. | Examination of patient to ascertain condition. |
| CAN PERFORM | 2. | Discusses problem with patient and prescribes Medication. CANNOT PERFORM surgery as needed. |

*Based on Need for full sensory capability, questionable if loss of index finger on non dominant hand would fully impair, I am excluding in order to provide conservative opinion.

(*Id.*).

## C. Defendant's Initial Denial of Benefits

In correspondence dated signed by Carol Timlin April 24, 2001, Reliance denied Dr. Freling's claim. The letter explained that because Dr. Freling was able to perform some of the duties required of an OB/GYN physician, he was not totally disabled under the Policy. (April 24, 2001 Letter from Timlin to Dr. Freling at 2). Timlin's letter further explained that in making the claim decision,

> [T]here was a complete review of the policy by management and this examiner, a complete review of [Dr. Freling's] medical records by the medical staff of our company and a complete evaluation of your occupational duties by a certified Senior Vocational Rehabilitation Coordinator. The medical information reviewed was received from the following providers of service: Memorial Hospital West, South Broward Hospital District, Florida EMS, Robert Rothfield, MD and Health South.

(Timlin Letter at 2).

Timlin's letter also gave justification for Defendant's denial of benefits by stating:

> You did not suffer any damage or injury to your dominant hand. The findings do not conclusively demonstrate or support any specific restrictions and limitations which would be considered severe enough to preclude you from performing each and every material duty of your

occupation throughout the Elimination Period of your coverage.

(*Id.*).

Reliance also advised Dr. Freling that his regular occupation was not his "job with a specific employer, it [was] not [his] job in a particular work environment, nor [was] it [his] speciality [sic] in a particular occupational field." (Timlin Letter at 1). Timlin explained that in evaluating Dr. Freling's eligibility for benefits, "we must evaluate your inability to perform your own or regular occupation as it is performed in a typical work setting for any employer in the general economy." (*Id.*).

As noted in Timlin's letter, the vocational review by Mr. Hardy concluded that Dr. Freling's injury did not prevent him from performing each of the seven enumerated duties for obstetricians and gynecologists listed by the DOT. Specifically, Defendant's correspondence stated that "[t]he medical findings that have been evaluated by our medical staff, management staff and this examiner, do not conclusively demonstrate or support any specific restrictions and limitations which would be considered severe enough to preclude you from performing the listed duties of an Obstetrician/Gynecologist." (Timlin Letter at 3). Thus, according to Reliance, Dr. Freling was not disabled from performing *each and every* material duty of his regular occupation, and his claim was denied. (*Id.*).

*D. Plaintiff's Appeal of Denial*

Through counsel, Dr. Freling appealed Defendant's denial of benefits by correspondence dated September 4, 2001. In the appeal letter, Plaintiff's counsel objected to Reliance's interpretation of the terms "occupation" and "material duties." Also on appeal, Dr. Freling submitted letters from a gynecologist, Dr. Susan Davila, and the surgeon who had operated on his hand, Dr. Robert E. Rothfield, in support of his position that he was unable to perform the material duties of *his* regular occupation. In a letter dated August 1, 2001, after noting that no further improvement of the left index finger or left middle finger would occur, Dr. Rothfield commented regarding Plaintiff's ability to work as a surgeon as follows:

As a surgeon, I can appreciate the manual dexterity that Dr. Freling would require were he to return to the operating room. It is my opinion that it would be difficult, if not impossible, to perform the necessary tasks he would be required to as a result of his injuries.

(Rothfield Letter at 1).

In an undated letter, Dr. Susan Davila, an OB/GYN, commented on Dr. Freling's ability to practice the profession of Obstetrics and Gynecology. Dr. Davila noted Dr. Freling's injuries and stated that:

These injuries and deficits would result in severe limitation, if not total inability to practice ob/gyn due [to] the following reasons:

His ability to perform pelvic and breast exams on a daily basis would be compromised as they both require full motor and tactile sensation of both hands for the comparison of tissue differences between the two hands. The index and middle fingers of both hands are the most sensitive fingers and the ones dominantly used by examiners, regardless of overall hand dominance. These fingers are used in concert to demarcate masses during breast, as well as pelvic exams. Some of these conditions being searched for are very subtle, so that less than full sensation on both hands would increase the likelihood of missing a change that would endanger a patients [sic] health. Also, high pelvic masses would be missed as the fingers on the non-dominant hand would be unable to feel them. His ability to perform surgery is obviously impaired by a lack of gross and fine motor coordination due to the loss of the left index finger, as well as the loss of sensation in both digits . . . . . Under ideal circumstances, Great [sic] care must be exercised to handle the baby during the delivery process. Often, expulsion is in a rapid unpredictable fashion and requires full manual dexterity for safe and proper handling, [sic] Also sudden, unforeseen maneuvers necessitated by clinical circumstance . . . again require full manual dexterity, which the loss of the left index finger and loss of sensation in the two left fingers severely compromises, resulting in a dangerous situation for the patient and baby. Even routine, necessary obstetric maneuvers such as fetal scalp electrode application and intrauterine pressure catheter insertion are rendered impossible by this disability. Delivery by cesarean section is also compromised for the reasons given above regarding surgery.

(Davila Letter at 1–2).

*E. Defendant's Denial of Appeal*

By letter dated February 7, 2002, Reliance's Manager of Quality Review Unit, Richard Walsh, denied Dr. Freling's appeal. In that letter, Dr. Freling was advised that the claim facts and denial of benefits were reviewed separately by an individual other than the one who had made the original decision. (Walsh Letter at 1). The letter discusses several grounds for Defendant's denial of Plain-

tiff's appeal. First, Walsh explains that Dr. Freling failed to provide satisfactory proof of his inability to perform each and every material duty of his regular occupation. With respect to Plaintiff's regular occupation and material duties, Mr. Walsh explained to Dr. Freling that:

The policy is not, necessarily intended to provide a benefit if an individual is unable to perform *each and every* material duty of his job at tenet [sic] Healthcare. The difference between an occupation and a job being that an occupation is a vocation or profession as it typically exists in the general economy whereas a job is a set of specific tasks performed for a specific employer.

(Walsh letter at 3).

While acknowledging Dr. Freling's contention that he only had two material duties as an OB/GYN Surgeon, the letter emphasizes that Tenet had identified Dr. Freling's title as OB/GYN *Physician*. Reliance could not agree that delivering babies and performing surgery were the only material duties of an OB/GYN *Physician*. Moreover, according to Mr. Walsh, the DOT would classify Dr. Freling's occupation as an OB/GYN *Physician*. As a result, Defendant relied on this title for referencing the DOT to determine the duties of an OB/GYN *Physician*.

Mr. Walsh further elaborated that a vocational consultant reviewed Dr. Freling's claim file "to determine if he believed [Dr. Freling] would be capable of performing some of the material duties of his regular occupation." (Walsh letter at 3). The letter states that Defendant relied upon its vocational consultant's finding, by use of the DOT, that there were numerous material duties of "the occupation" that Dr. Freling could perform. (*Id.*).

Mr. Walsh's letter next explains that existing medical literature suggests that "an individual with the proper motivation would be able to overcome injuries to his non-dominant hand and adapt his performance so that he could perform all of the material duties of an OB/GYN Physician." Mr. Walsh then summarizes the findings of an article by Dr. Paul Brown entitled: *Less Than Ten—Surgeons with Amputated Fingers*, as follows:

In the article Dr. Brown found that out of 183 surgeons who had lost digits or parts of their hand, only three claimed any significant professional disability, all others continued to practice operative surgery. Out of the 180 who continued to practice operative surgery, 14 were noted to be gynecologists. Out of three who ceased working as a result of the finger amputation, none were noted to be gynecologists.

(Walsh Letter at 4). Defendant found that the article did not support a position that Dr. Freling was unable to perform all the material duties of his regular occupation.

Reliance's denial letter further explains the significance of the article as follows:

Dr. Brown concluded that motivation will play a large role in a digitally challenged surgeon's ability to return to his normal pursuits. In the present case, Dr. Freling is certainly aware that his employer, Tenet Healthcare Corporation, closed the office in which he was an employee on November 10, 2000, less than one month after his accident. Because Dr. Freling knew that he did not have an immediate job to return to after his accident, one must question whether he would have the same motivation to try to quickly rehabilitate himself as a person who knew his job were safe. Given the lack of an immediately available job, and the significant amount of monies available from this policy and a separate individual disability policy, one must question whether secondary gain played any role in Dr. Freling's claimed

inability to perform *each and every* material duty of his regular occupation. (Walsh Letter at 5).

Reliance next addresses Dr. Rothfield's and Dr. Davila's opinions:

> We would suggest that the letters might support a claim that your client may have difficulty with certain aspects of his work, but that the letters do not support a conclusion that Dr. Freling would be precluded from performing *each and every* material duty of his occupation as an OB/GYN Physician.
>
> . . . .
>
> Dr. Rothfield suggests that your client would have a difficult time performing some of the duties in the operating room and Dr. Davila comments that he would have severe limitations. Both then go on to suggest that it might even be impossible to perform certain functions. Rather than concluding that the performance of his duties would be impossible, both physicians begin by explaining that the performance would be difficult before qualifying that it may be even impossible to perform the duties. Certainly neither physician suggests that he could not perform at least some of the duties of his occupation and both implicitly suggest that they believe the duties could be performed with some difficulty (perhaps depending upon motivation, as suggested by Dr. Brown).

(Walsh Letter at 5). Reliance does not dispute that Dr. Freling was unable to work immediately following his accident and for a short period of time after his surgery on October 18, 2000.

## II. ANALYTICAL FRAMEWORK

### A. Summary Judgment Standard

Under Rule 56(c), Fed.R.Civ.P., a motion for summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." By its very terms, this standard provides that the mere existence of "*some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there will be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (emphasis in original); *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). An issue is "material" if it is a legal element of the claim under the applicable substantive law which might affect the outcome of the case. *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505; *Allen v. Tyson Foods*, 121 F.3d 642, 646 (11th Cir.1997). An issue is "genuine" if the record taken as a whole could lead a rational trier of fact to find for the non-moving party. *Allen*, 121 F.3d at 646.

The parties agree the material facts are not in dispute and that the only remaining issue is a purely legal one, appropriate for resolution by summary judgment.

### B. ERISA Standard

The Eleventh Circuit has developed the following standards for judicial review of an administrator's eligibility determinations: "(1) *de novo*, applicable where the plan administrator is not afforded discretion, (2) arbitrary and capricious when the plan grants the administrator discretion, and (3) heightened arbitrary and capricious where there is a conflict of interest." *Paramore v. Delta Air Lines, Inc.*, 129 F.3d 1446, 1449 (11th Cir.1997). In the present case, the parties agree that Reliance had discretion to interpret the

terms of the Policy and to determine Plaintiff's eligibility for benefits. Also, an inherent conflict of interest exists because Reliance pays beneficiaries out of its own assets rather than the assets of a trust. *See* 240 F.3d at 1001 (citing *Brown v. Blue Cross & Blue Shield,* 898 F.2d 1556, 1561–62 (11th Cir.1990)). However, a court need only consider whether the administrator's decision was "tainted by self interest," if it first finds that the administrator's determination is wrong. *See* 240 F.3d at 994.

The analysis that a court must undertake was further clarified by the Eleventh Circuit in *HCA Health Serv. of Georgia, Inc. v. Employers Health Ins. Co.,* 240 F.3d 982, 993 (11th Cir.2001). The *HCA* court explained that:

> In reviewing a claims administrator's benefits determination, the court follows a series of steps. The applicability of heightened arbitrary and capricious review is a result of the court making a specific determination at each step in the analysis. At each step, the court makes a determination that results in either the progression to the next step or the end of the inquiry.

240 F.3d at 993.

■ Under the heightened arbitrary and capricious standard, the Court proceeds to the next step, which consists of an evaluation of the administrator's interpretation of the policy and its factual findings to determine whether the administrator's interpretation and findings are wrong. *Id.* (quoting *Godfrey v. BellSouth Telecommunications, Inc.,* 89 F.3d 755, 758 (11th Cir. 1996) (conducting *de novo* review of admin-

istrative record to determine whether administrator's determination was wrong)); *Torres v. Pittston Co.,* 346 F.3d 1324, 1332 (11th Cir.2003) (holding that the heightened standard also governs the ERISA fiduciary's factual determinations). " 'Wrong' is the label used by [the Eleventh Circuit] to describe the conclusion a court reaches when, after reviewing the plan documents and disputed terms *de novo,* the court disagrees with the claims administrator's plan interpretation." *HCA,* 240 F.3d at 994, n. 23. In reviewing Reliance's determination to deny Plaintiff's claim for disability benefits, the Court is required to look only to the facts known by Reliance at the time the decision to deny benefits was made.[5] *Lee v. Blue Cross/Blue Shield of Alabama,* 10 F.3d 1547, 1550 (11th Cir.1994).

■ After taking this step, and only if the Court disagrees with the claims administrator's interpretation or findings, must the Court next determine whether the Plaintiff propounds a sound and reasonable interpretation of the plan. *HCA,* 240 F.3d at 993 (citing *Lee,* 10 F.3d at 1550); *Florence Nightingale Nursing Serv., Inc. v. Blue Cross/Blue Shield of Ala.,* 41 F.3d 1476, 1481 (11th Cir.1995); *Brown,* 898 F.2d at 1570. If Plaintiff presents a reasonable interpretation, then the Court must apply principles of *contra proferentem*[6] and construe ambiguities against the drafter of the document to find an administrator's interpretation incorrect. *Florence Nightingale,* 41 F.3d at 1481. A finding that Plaintiff's interpretation is reasonable only takes the Court to the next step in the analysis. *See HCA,* 240 F.3d at 994

---

**5.** The Court has relied entirely on the administrative record, and thus does not reach the issue of whether it may otherwise consider the deposition testimony of Richard Walsh and Thomas Hardy. Moreover, Plaintiff's affidavit submitted in support of his Motion for Summary Judgment is not properly before the

Court as it, too, was not part of the administrative record.

**6.** The rule of *contra proferentem* is appropriate for resolving ambiguities in insurance contracts governed by ERISA. *Lee,* 10 F.3d at 1551.

("Even if the court determines that the claimant's interpretation is reasonable, the claimant does not necessarily prevail.")

■ The Court must next examine "whether the claims administrator's wrong interpretation is nonetheless reasonable." *Id.* It is at this stage that the distinction between an arbitrary and capricious standard and the heightened standard becomes apparent. Under the arbitrary and capricious standard, a claims administrator's wrong but reasonable interpretation is entitled to deference. *Id.* However, under the heightened standard, a wrong but reasonable interpretation requires the Court to proceed to the next step in the analysis. *Id.*

■ At this final step, "the burden shifts to the claims administrator to prove that its interpretation of the plan is not tainted by self-interest. The claims administrator satisfies this burden by showing that its wrong but reasonable interpretation of the plan benefits the class of participants and beneficiaries." *Id.* at 994–95. Thus, "a wrong but apparently reasonable interpretation is arbitrary and capricious if it advances the conflicting interest of the fiduciary at the expense of the affected beneficiary or beneficiaries unless the fiduciary justifies the interpretation on the ground of its benefit to the class of all participants and beneficiaries." *Brown,* 898 F.2d at 1566–67.

### III. APPLICATION OF ERISA STANDARD OF REVIEW TO THE UNDISPUTED FACTS

The issue thus presented is whether Reliance's denial of disability benefits was arbitrary and capricious under the heightened standard of review. Applying the above step-by-step analysis, the Court first examines Reliance's interpretation of the Policy. The Court next examines Reliance's factual determinations under the applicable analytical framework.

### A. Interpretation of the Policy

The parties agree and the undersigned's own review reveals that the term "regular occupation" is not defined by the Policy. Moreover, a method for determining an insured's material duties is not prescribed by the Policy. Dr. Freling does not dispute that under the Policy he must be completely unable to perform each and every material duty of his regular occupation to qualify for benefits. Nor does Dr. Freling dispute Reliance's finding that he is able to perform five of the seven tasks that are listed under the DOT categories chosen by Reliance.

Dr. Freling maintains, however, that he is entitled to benefits under the Policy because the regular occupation practiced by him only had two material duties: delivering babies and performing surgery. It is undisputed that Plaintiff cannot perform these duties. In contrast, Reliance contends that it reasonably considered the tasks listed under the DOT descriptions for Obstetrician and Gynecologist to determine Plaintiff's material duties. Defendant further argues that Dr. Freling's suggested construction defines his *job* rather than his *occupation.*

The Court first reviews the terms "regular occupation" and "material duties," as Plaintiff's eligibility for benefits is based on these terms. The Court addresses each disputed term in turn.

#### 1. "Regular Occupation"

##### a. Is Defendant's interpretation of "Regular Occupation" correct?

■ Construction of the scope of the term "regular occupation" is relevant to determining what material duties Dr. Freling had within that occupation. Defendant relied on the DOT to define Plaintiff's regular occupation because it contends that the DOT is sometimes used by benefit

plans and courts to define occupations in the *national economy*. (Def.'s Mem. Supp. Mot. Summ. J. at 10). In both denial letters, Reliance explained that it was interpreting "regular occupation" to mean the insured's vocation or profession as it typically exists in the general economy, and thus reference to the DOT was reasonable to assist in the determination of Dr. Freling's duties.

A plain reading of the unambiguous terms of the Policy, however, does not suggest such a broad interpretation. Within the applicable provision of the Policy, the term "regular occupation" is modified by the qualifier "his/her." Thus the Policy's plain language supports some particular connection between the insured and the occupation, rather than a "national" standard. This construction is also supported by a plain and fair reading of the subsequent provision defining eligibility for benefits after twenty-four months of payments, when the insured is considered disabled only if he or she "cannot perform material duties of *any* occupation." Thus, within the Policy itself, the term occupation is broadened, but only after the insured has already received twenty-four months of payments. *See Brown*, 898 F.2d at 1570 (the internal consistency of a plan under the fiduciary's interpretation has relevance).

The Court therefore disagrees with the interpretation offered by Reliance, as it would broaden the term "regular occupation" to mean "any" occupation during the elimination period. *See e.g., Dionida v. Reliance Standard Life Ins. Co.*, 50 F.Supp.2d 934, 940 (N.D.Cal.1999) (finding that "Reliance erroneously substituted the 'any occupation' standard in lieu of the 'regular occupation' standard" in evaluating plaintiff's claim). Such an interpretation is inconsistent with the eligibility requirements after twenty-four months and therefore is incorrect.

### b. Does Plaintiff offer a reasonable interpretation of "Regular Occupation"?

Having determined that Reliance's Policy interpretation is wrong, the Court next examines whether Dr. Freling proposes a reasonable interpretation of the Policy. *HCA*, 240 F.3d at 994. Relying on the Florida Supreme Court decision in *Berkshire Life Insurance Company v. Adelberg*, 698 So.2d 828 (Fla.1997), Dr. Freling maintains that "regular occupation" should be construed as particularly referring to his specific medical practice, his specialty, his duties, or what he did on a daily basis in his occupation. In *Adelberg*, the Florida Supreme Court considered the following question certified by the Eleventh Circuit Court of Appeals:

When the term "occupation" is left undefined in an occupational disability insurance policy which states that total disability means "your inability to engage in your occupation" does the term "your occupation" refer to precisely (and only) the work in which the insured is engaged at the time of the injury, or should the term be interpreted more generally to include any work requiring similar skills and producing a comparable income?

*Id.* at 830. The question was certified after the defendant insurance company, which advocated a broader definition, appealed the district court's finding relating to the plaintiff's occupation. *Id.*

The Florida Supreme Court began its analysis by restating the "tenet of Florida insurance law that an insurer, as the writer of an insurance policy, is bound by the language of the policy, which is to be construed liberally in favor of the insured and strictly against the insurer." *Id.* at 830 (citing *Firemans Fund Ins. Co. v. Boyd*, 45 So.2d 499, 501 (Fla.1950)). The Florida Supreme Court then found that as a result

of the insurance company's failure to limit the term "occupation" within the policy provisions, the term should be interpreted in favor of coverage for the plaintiff. *See id.* The *Adelberg* court persuasively reasoned:

> Berkshire chose to state in this policy that total disability means "your inability to engage in your occupation." Berkshire likewise chose that, after 120 months of payments, total disability would mean "any gainful occupation." We conclude that the language chosen by Berkshire would lead a reasonable person reading this policy to conclude that for the first 120 months "your occupation" means the work in which he or she is engaged at the time of becoming disabled. In construing this policy, we simply give the term "your occupation" the meaning that an average buyer of an insurance policy would give to the term. Berkshire's contention that "your occupation" should be read to mean any sales position rather than the sales position Adelberg held at the time he was injured is not a distinction made by Berkshire in writing its policy. If this was Berkshire's intent, the company should have so stated in unambiguous language.

*Id.*

Dr. Freling's reliance on *Adelberg* is well-placed and he has offered a reasonable interpretation of the words "regular occupation." In the alternative, the term "regular occupation" is subject to various meanings and is therefore ambiguous. As a result, this term must be construed in favor of the insured. *Florence Nightingale,* 41 F.3d at 1481.

### c. Is Defendant's wrong interpretation nonetheless reasonable?

Defendant nonetheless attempts to distinguish *Adelberg* by suggesting that the court construed "occupation" rather than "regular occupation." Alternatively, Defendant argues that its interpretation of the term is consistent with the Florida Supreme Court decision. Reliance's arguments are unpersuasive.

Reliance's argument that its construction of the term "his/her regular occupation" is consistent with *Adelberg* is not supported by the facts. Like the policy in *Adelberg,* the Policy in the present case contains different definitions of disability depending on the relevant time period under consideration (e.g. Elimination Period, after 120 months). Thus, the reasoning employed in *Adelberg* is highly persuasive, since Reliance similarly advocates a more general and consequently broader definition of the term "regular occupation." As discussed, imposing a broader definition during the elimination period would render the distinction made in the existing and more general definition of occupation, after twenty-four months, meaningless. Also, Dr. Freling, like the insured in *Adelberg,* had no notice within the terms of the Policy or any other document that his regular occupation would be broadly defined according to a government publication containing generic occupational definitions.

The parties' briefs and the Court's own review reflects a dearth of cases construing the same terms by the Eleventh Circuit. However, decisional law from other circuits is persuasive and helpful to the Court's evaluation. The Second Circuit construed the term "regular occupation" in a policy issued by this same Defendant. In *Kinstler v. First Reliance Standard Life Ins. Co.,* the Second Circuit found that the term "regular occupation" means a position of the same general character as the insured's previous job. 181 F.3d 243, 252–253 (2d Cir.1999) (citing *Dawes v. First Unum Life Ins. Co.,* 851 F.Supp. 118, 122 (S.D.N.Y.1994) (applying New York state law)).

The *Kinstler* court found that plaintiff's regular occupation should not be defined so narrowly so as to include only her job, but, rather, the term should encompass that which has the same character as her job. *Id.* at 252–253. As a result, it was found that the defendant incorrectly relied on a more general classification of the plaintiff's regular occupation when it used the DOT to define her occupation. *Id.* The defendant's reliance on the DOT was improper because the DOT classification chosen by the defendant did not reflect the character of her job, as the DOT listed only sedentary tasks, whereas the plaintiff's actual job included non sedentary duties. *Id.*

*Kinstler* and *Adelberg* support an examination of the character and nature of Dr. Freling's work with his employer as a relevant exercise in helping to define his "regular occupation" under the Policy. Curiously, Reliance has even argued a similar construction in other cases. *See e.g., Dionida,* 50 F.Supp.2d at 940 (where Reliance argued that "regular occupation" has been held to mean a position of the same general character as the insured's previous job).

In another case involving a Reliance disability benefits policy, the court found that the insurer's use of the DOT to define the insured's regular occupation was also improper. *See Ebert v. Reliance Standard Life Ins. Co.,* 171 F.Supp.2d 726 (S.D.Ohio 2001). The *Ebert* court stated:

The policy does not define the duties of an insured's regular occupation to mean the duties of a 'similar' DOT-specified occupation. Defendant is not is [sic] a position where it must determine Plaintiff's regular job duties in the absence of an actual job description. The Hospital provided a job description as well as a supplemental job description at the request of Defendant that further described the duties required while at work at the Hospital.... There is no reason to assume that a national standard set forth in the DOT defines the duties of Plaintiff's regular occupation. *Id.* at 735. While rejecting the application of a "national standard," the court also noted the difference, as here, between the definition of total disability during the elimination period and after the elimination period. *Id.* at 735, n. 4.

More recently, the Third Circuit has also examined the meaning of the term "regular occupation" in *Lasser v. Reliance Standard Life Ins. Co.,* 344 F.3d 381 (3d Cir.2003). Finding the term unambiguous, the *Lasser* court stated: "Both the purpose of disability insurance and the modifier 'his/her' before 'regular occupation' make clear that 'regular occupation' is the usual work that the insured is actually performing immediately before the onset of disability." *Id.* at 386. In the alternative, the *Lasser* court found that even if the term were ambiguous, it considered an interpretation contrary to the plain meaning of the term unreasonable when Reliance failed to explicitly include such a different definition in the policy. *Id.*

The reasoning applied in these cases is persuasive and applicable. In contrast, the authorities cited by Defendant in support of a national construction are distinguishable. *Cf. Lasser,* 146 F.Supp.2d at 633 (citing cases from other jurisdictions finding DOT ineffective authority). For example, a careful examination of the holding in *Dionida v. Reliance Standard Life Ins. Co.* reveals that the court did not make a finding that Reliance had correctly interpreted the term "regular occupation" by its use of the DOT. *See* 50 F.Supp.2d 934, 940–941. Rather, the court found that Reliance had failed to use a DOT classification that was of the same general character as the plaintiff's previous occupation. *Id.* at 941. In *Winters v. UNUM Life*

*Insurance Co.,* also relied upon by Defendant, the use of the DOT was not disputed by the parties, and the DOT classification was comparable to the nature of the plaintiff's job. 232 F.Supp.2d 918, 931 (W.D.Wis.2002).

■ The definition of Dr. Freling's regular occupation requires, at a minimum, reference to Plaintiff's specific medical practice, his specialty, duties or what he did on a daily basis in his occupation. *See id.* His specific practice, specialty or daily duties are referenced only for determining the character and nature of Plaintiff's regular occupation. The Policy is certainly not construed to provide disability benefits where all that is presented is that the insured is unable to perform a specific job with a specific employer.

Reliance's interpretation that the term "regular occupation" incorporates a "national standard" was unreasonable. *See Lasser,* 344 F.3d at 387 (finding defendant's definition of "regular occupation" which was contrary to plain meaning of term, unreasonable). As such, the Court is not required to reach the next step of the analysis with respect to this term, and determine whether Defendant's interpretation was tainted by self-interest.[7] *See HCA,* 240 F.3d at 993 ("At each step, the court makes a determination that results in either the progression to the next step or the end of the inquiry."). The Court must, however, proceed to examine whether, despite its incorrect interpretation of "regular occupation," Defendant nonetheless correctly determined the material duties of Dr. Freling's regular occupation.

### 2. "Material Duties"

#### a. Is Defendant's interpretation of Plaintiff's "Material Duties" correct?

■ Defendant assumed the tasks listed in the selected DOT classifications defined Dr. Freling's material duties. In accordance with the above analysis, however, a definition of Plaintiff's material duties must be done with reference to the character of Dr. Freling's occupation as practiced by him. To sanction a determination based on the tasks listed in the DOT without further analysis of the materiality of these tasks in Plaintiff's occupation, would give the term "material" as used in the Policy a meaning the parties did not select.

The record lacks, and Defendant has failed to provide, any authority that the DOT conclusively lists each and every material duty of a listed occupation. Aside from Defendant's automatic reliance on the DOT, the administrative record fails to show that Reliance examined the materiality of the tasks listed in the DOT classification with respect to Dr. Freling's regular occupation. The language of the Policy expressly contemplates an examination of the insured's material duties. The Court, therefore, disagrees with Reliance's interpretation of "material duties" and concludes that application of the DOT classification, without any analysis, was "wrong."

#### b. Does Plaintiff offer a reasonable interpretation of "Material Duties"?

In its initial *de novo*[8] review, the Court finds that Plaintiff's argument is best ar-

---

7. Although the Court is not required to proceed with a self-interest analysis with respect to interpretation of the Policy, the Court does proceed to the next step of the analysis as to Reliance's factual findings. The discussion relating to Reliance's self-interest, *infra,* also includes an analysis of Reliance's possible motive behind its Policy interpretation.

8. Judicial review of the administrative record is *de novo. Godfrey,* 89 F.3d 755, 758. This is distinguishable from application of *de novo* review in a case where a plan administrator has no discretion. *Paramore,* 129 F.3d 1446, 1449.

ticulated in the administrative record. In his appeal letter, Dr. Freling specifically objected to Mr. Hardy's use of the DOT to define material duties. Dr. Freling argued that Reliance must look to the claim file or request from him what the "material duties" of his occupation were.

In the absence of relevant authority from the Eleventh Circuit, the Court is guided by the rationale employed by another jurisdiction that examined the materiality of an insured's duties. In *Lasser v. Reliance Standard Life Insurance Co.*, the district court found that:

> [T]he materiality of a given occupational duty depends upon the importance of that duty to the claimant's professional endeavors, measured as a combination of the amount of time the activity consumes and its qualitative importance to the professional mission. A duty is "material" when it is sufficiently significant in either a qualitative or quantitative sense that an inability to perform it means that one is no longer practicing the "regular occupation."

146 F.Supp.2d 619, 636 (D.N.J.2001).

Mindful that a court cannot limit the term "regular occupation" to an insured's previous job, the court clarified that:

> [A] claims administrator considering an occupational disability claim must make some allowance for the mode in which the claimant practiced her or his profession. To rely solely on broad job classifications without some consideration for the geographical or institutional context ascribes a fungibility to the occupations of insureds that is consistent

with neither reality nor the "regular occupation" formulation of the policy. *Id.* at 636 (emphasis added).

Borrowing the definition of "materiality" from the *Lasser* district court, the Court concludes that Dr. Freling has offered a reasonable interpretation. Accordingly, the Court proceeds to the next step.

### c. *Is Defendant's wrong interpretation nonetheless reasonable?*

Reliance does not dispute that it failed to make an attempt to distinguish or confirm which tasks listed in the DOT classification were *material* duties, as is expressly required under the Policy. *See Lasser*, 146 F.Supp.2d at 632–33 (discussing ineffectiveness of the DOT for defining material duties of insured's occupation). The record does not reflect an attempt by Reliance to examine the nature of Dr. Freling's regular occupation as it was practiced by him on a daily basis prior to his disability. Indeed, the record of Timlin's interview with Plaintiff indicates that Dr. Freling was asked what he could do rather than what his material duties were. His response that he could do "reports and things" is not an admission that these tasks were material duties of his occupation prior to his disability. Moreover, Defendant relied on the DOT despite the availability of record evidence indicating that Dr. Freling spent 80% of his time on surgery, delivering babies, and conducting pre and post operative care.[9] Defendant's failure to examine the materiality of Plaintiff's duties, in light of the available evidence in the record is troubling. *Cf. Weinberger v. Reliance Standard Life Ins. Co.*, 54 Fed.Appx. 553, 555–57 (3d Cir.

---

9. The record reflects that Defendant's own investigation elicited from Plaintiff an estimate that 80% of his working hours were spent in obstetrical and gynecological surgery, the delivery of babies, and pre and post operative surgical and obstetrical care. Plaintiff also estimated that the other 20% of his work hours were spent performing office care of patients, which included full exams, breast exams, pelvic exams and other gynecological testing procedures. Defendant's breakdown of 60/40% is provided without explanation.

2002) (finding defendant's reliance on DOT inappropriate when insured had provided actual requirements of his position).

The denial letters establish that Defendant relied entirely on the DOT to define the doctor's duties. The cases cited by Reliance do not support an automatic reliance on the DOT to define an insured's material duties. *See e.g. Jackson v. Metropolitan Life Ins. Co.,* 303 F.3d 884 (8th Cir.2002) (identification of material duties of insured was not at issue, rather court examined insurer's denial of extended disability payments, as insured was capable of performing duties of another occupation); *Lopes v. Metropolitan Life Ins. Co.,* 332 F.3d 1 (1st Cir.2003) (material duties of insured were not at issue, rather the court examined insurer's finding that insured was capable of sedentary work and thus not eligible for continued disability payments); *Gallagher v. Reliance Standard Life Ins. Co.,* 305 F.3d 264 (4th Cir.2002) (defendant turned to DOT *after* employer failed to give details of insured's occupational duties and there was no discrepancy between DOT description and actual job of insured); *Ceasar v. Hartford Life and Acc. Ins. Co.,* 947 F.Supp. 204, 208 (D.S.C.1996) (plaintiff sought to impose additional duties by reference to specific job). Moreover, Dr. Freling's position is different from the position asserted in the cases cited, as he does contest the materiality of the tasks identified by Reliance.

Reliance cites to *Ehrensaft v. Dimension Works Inc. Long Term Disability Plan,* in support of its position that Dr. Freling's *job* is different from his *occupation.* 120 F.Supp.2d 1253, 1258–1259 (D.Nev.2000). However, in *Ehrensaft,* the plaintiff did not dispute whether the tasks listed under a DOT classification were material duties of his occupation. *See id.* The *Ehrensaft* plaintiff claimed he was entitled to benefits because he could not perform *additional* duties imposed upon him by his specific employer. *Id.* Thus, *Ehrensaft* also fails to support Defendant's automatic reliance on the DOT.

Defendant has failed to assert a basis, supported by the administrative record, for its determination that all of the DOT tasks comprised the material duties of Plaintiff's regular occupation. Accepting each task under the DOT classification as a material duty of Plaintiff's occupation may only be considered reasonable if Defendant's broad interpretation of "regular occupation" is well-founded. Reliance maintains that the DOT has been routinely used by benefit plans and courts to define "occupations" and their material duties in the national economy. However, the Court has already determined that a broad "national" construction of Dr. Freling's regular occupation is incorrect because of the Policy language at issue.

Rather than explain how it determined that all the tasks listed under the selected DOT definitions comprise Dr. Freling's material duties, Reliance instead refers to cases from other jurisdictions in which physicians who were unable to perform surgeries were nonetheless denied disability benefits because of their ability to perform other duties. These cases are also distinguishable. *See e.g., Dym v. Provident Life and Acc. Ins. Co.,* 19 F.Supp.2d 1147 (S.D.Cal.1998) (plaintiff was asked to list his "important duties" and was found to be capable of performing minor surgeries, a task to which plaintiff devoted a substantial portion of his practice); *Klein v. Nat'l Life of Vermont,* 7 F.Supp.2d 223 (E.D.N.Y.1998) (finding that plaintiff did not spend the majority of his time performing surgery at the time of his disability); *Yahiro v. Northwestern Mut. Life. Ins. Co.,* 168 F.Supp.2d 511 (D.Md.2001) (plaintiff claimed that surgery comprised only 25% of his practice, and thus surgery could not be the only material duty); *Ames v. Provident Life and Acc. Ins. Co.,*

942 F.Supp. 551 (S.D.Fla.1994) (plaintiff did not dispute insured's determination of his material duties).

In summary, it was unreasonable for Reliance to automatically turn to the DOT and assume that each listed task was a material duty of its insured's regular occupation. To the extent that Defendant used the DOT because it defines occupations in the national economy, the resulting expansive construction of the term "occupation" is not supported by the Policy language. Had Reliance wanted to do so, it could have incorporated the DOT classifications into the Policy language to give meaning to the Policy's terms. Moreover, Dr. Freling and his employer supplied Defendant with evidence of the material duties of Plaintiff's regular occupation, evidence that was not addressed by Defendant.

The second denial letter disagrees with Plaintiff's classification of his material duties, but fails to provide a basis for the disagreement. While it may be true that Dr. Freling had duties in his practice beyond the two material duties he identified, the Policy requires Reliance to focus on Plaintiff's *material* duties. On this record, robotic application of the DOT definitions was wrong and unreasonable. Accordingly, the Court need not reach the next step of the analysis, relating to Defendant's self-interest, with respect to this term. *See HCA,* 240 F.3d at 993. Defendant's denial of benefits based on its Policy interpretation was arbitrary and capricious.

*B. Defendant's Factual Findings*

*1. Were Defendant's Factual Findings Correct?*

The Court next examines whether Reliance's finding that Dr. Freling was not disabled was an arbitrary and capricious

conclusion. In other words, the issue is whether Reliance correctly found that Dr. Freling failed to provide satisfactory proof of his disability.

Throughout the claim process, the record reflects that Reliance focused on the fact that Dr. Freling sustained an injury to his *non dominant* hand. Indeed, in the first denial letter, the claim administrator emphasized that Dr. Freling did not suffer any damage or injury to his dominant hand. It appears that the doctor also viewed this as Reliance's main concern. As a result, Dr. Freling submitted letters from his treating physician and a practicing OB/GYN to rebut Defendant's finding that he could still perform his material duties without his injured, non dominant hand.

In the second denial letter, the claim administrator indicates that Dr. Freling's supporting letters were construed as indicating that Plaintiff would only have difficulty in performing his material duties, rather than that these tasks were impossible to perform. Defendant correctly notes that Dr. Davila is not a vocational specialist. Nonetheless, as a practicing OB/GYN she would have solid familiarity with what level of functionality is required to perform the duties within this occupation. The letter submitted by Dr. Davila,[10] read as a whole, indicates that both hands are required for performing examination on patients, as well as for delivering babies and performing surgeries.

In further support that Dr. Freling could perform his duties, Reliance discussed a *medical journal article* in its second denial letter. Reliance stated that the letters submitted by Dr. Davila and Dr. Rothfield are "flatly contradicted by the article 'Less than ten—Surgeons with amputated fingers' from the Journal of Hand

---

**10.** Dr. Rothfield's letter focused on Plaintiff's ability to perform surgery, a duty which Defendant concedes Plaintiff cannot perform.

Thus, the Court restricts its examination to the consideration given to Dr. Davila's opinions.

Surgery." The article in question dates back to 1981 and contains a survey conducted of 183 surgeons who had lost parts of their hands. (RSL 00225–31). The Court's own review of the article does not reveal any specific findings or conclusions made with respect to a surgeon's ability to perform the material duties of his or her occupation after losing a part of his or her hand. Moreover, the article does not provide a basis from which to conclude that the insured in the present case can perform the material duties of his occupation without his non dominant hand. Rather, the abstract indicates only that "[t]he conclusion ... is that motivation of the patient is more important to hand function than the actual number of digits." (RSL 00225).

Reliance determined that Dr. Freling was capable of performing his material duties based on the result of this twenty-year old survey of surgeons who had found the right motivation within themselves to overcome their respective difficulties. The Policy language does not provide any suggestion that Plaintiff's ability to perform would be measured against the capability of other people in other occupations to overcome their own difficulties. The Court fails to find the logical connection between a present inability of Plaintiff to use his non dominant hand and his future motivation to perform his duties despite his amputation. Moreover, the Policy language does not impose the requirement of having a "right attitude" or "motivation," or that the insured try to find the inspiration to perform the material duties of his occupation with his injury. To the extent that Reliance questions Plaintiff's motivation based on the closing of Tenet's office, there is no evidence in the record to support that Dr. Freling's claim was fraudulent or that the injury to his non-dominant hand and claim for benefits were deliber-

ately made in temporal proximity to Tenet's announcement of its forthcoming closure.

■■■■ Absent the article, there is nothing in the record to support Reliance's finding that Dr. Freling's occupation did not require the use of both hands. In contrast, Dr. Freling's claim that he cannot perform his duties is amply supported by the administrative record. Moreover, Reliance has failed to adequately support its refusal to consider the opinions of Dr. Davila. The rationale provided in the second denial letter reflects a self-serving and illogical reading of Dr. Davila's letter. As Defendant's vocational review was dependent upon the misconception that the doctor only required one hand, as well as the survey article, the Court concludes that Reliance's determination was wrong. *See Lake v. UNUM Life Ins. Co. of America*, 50 F.Supp.2d 1243, 1253 (applying heightened standard and holding that "if the claimant shows that [his] factual allegations are supported in the record, the court will draw all inferences from the facts against the plan administrator, to find that the administrator's factual determinations are wrong"); *Torres*, 346 F.3d at 1334 (holding that heightened standard of review also applies to administrator's findings of fact).

### 2. Was Defendant's Wrong Determination Nonetheless Reasonable?

Under the heightened arbitrary and capricious standard of review, the Court next seeks to determine whether there was a reasonable basis for the administrator's decision. *See Paramore*, 129 F.3d 1446, 1451. The vocational review and the medical review notes in the record indicate that the review was premised on the unsupported belief that Dr. Freling could perform his duties with only one intact hand.[11] Reliance summarily disregarded Dr. Frel-

---

11. Mr. Hardy's vocational review specifically noted that Plaintiff injured his non dominant

ing's evidence, in the form of an opinion from a practicing OB/GYN, that Plaintiff's duties required the use of two hands.

Curiously, while discrediting Plaintiff's submission as lacking vocational expertise, Defendant relies heavily on an article that merely reviews the survey results of highly-motivated surgeons with missing hand parts. In the absence of any other supporting vocational evidence, Defendant's persistent reliance on an article that only suggests that surgeons can continue to practice despite severe hand injuries is unreasonable. *See Levinson v. Reliance Standard Life Ins. Co.*, 245 F.3d 1321, 1326 (11th Cir.2001) (affirming district court's finding that insurer's decision was arbitrary and capricious when the record lacked evidence contradicting that offered by plaintiff); *see also Smetana v. Reliance Standard Life Ins. Co.*, No. Civ–A. 01–CV–4339, 2003 WL 22594263, *6–7 (E.D.Pa. 2003, Sept. 30, 2003) (finding defendant's use of evidence supporting denial of benefits while failing to satisfactorily explain rejection of evidence supporting award to be arbitrary and capricious).

Because there was no support in the record for Reliance's decision, it was wrong and accordingly unreasonable. Again, the Court is not required to proceed to the next step and determine whether Defendant can establish that its decision was not tainted by self-interest. *See HCA*, 240 F.3d at 993, *Guy v. Southeastern Iron Workers' Welfare Fund*, 877 F.2d 37 (11th Cir.1989) (court did not reach conflicting interests analysis where trustees' decision did not survive highly-deferential standard of review).

*3. Did Self–Interest Motivate Defendant?*

 Alternatively, the same reasons that establish the unreasonableness of De-

fendant's decision indicate that the decision was tainted by self-interest. *See Lake v. UNUM Life Ins. Co. of America*, 50 F.Supp.2d 1243, 1256 (M.D.Ala.1999) (finding that defendant's failure to consider doctor's notes supporting plaintiff's claim appeared motivated by self-interest). Defendant insists on a construction of terms that is not supported by the plain meaning of the Policy. Reliance clearly has a pecuniary interest in utilizing a broad construction of the Policy terms that would allow an automatic application of the DOT. The more duties Reliance can identify as "material," the more likely it is that an insured will be able to perform at least one duty and thus be disqualified from the receipt of benefits under the Policy.

Reliance's persistent claim that all the DOT tasks comprise Dr. Freling's material duties is belied by the description obtained by Defendant's own investigator. A failure to acknowledge and distinguish Plaintiff's "80/20%" breakdown suggests that Reliance was motivated by self-interest in broadly defining its insured's regular occupation and material duties.

Again, the initial review by Carol Timlin suggests that the focus of the investigation was in determining whether Plaintiff could still perform his duties with one hand. It was not until Dr. Freling submitted evidence reflecting that he required the use of both hands, that Defendant produced the survey article in support of its decision. Reliance's failure to seriously consider the letters supporting Dr. Freling's claim, in combination with the heavy emphasis given the survey article, lead to an inference that Defendant was motivated by self-interest. Reliance also could have easily obtained an independent medical examination to contradict the doctors' letters rather than rely on an inconclusive and

hand. Also, one of his conclusions was qualified with the notation that it was "questiona-

ble if loss of index finger on non dominant hand would fully impair."

dated survey article.[12] Reliance's failure to do so also suggests that its review was motivated by self interest. *See Jett v. Blue Cross & Blue Shield of Alabama, Inc.,* 890 F.2d 1137, 1142 (11th Cir.1989) (finding insurer was arbitrary and capricious in manner in which it responded to plaintiff's claim because insurer relied solely on outside consultant's opinion and failed to adequately investigate claim).

 Reliance has the burden of establishing that its interpretation was not tainted by self-interest. *Brown,* 898 F.2d at 1566–67. Despite this burden, Reliance has not adequately addressed this issue in its memoranda, to its detriment. The Court finds that, if Reliance's conclusions are not unreasonable, then Defendant has failed to establish that its determinations were not motivated by self-interest, and thus its decision was arbitrary and capricious.

## IV. CONCLUSION

As neither party has contested the completeness of the administrative record, remand to the plan administrator is not warranted under the facts. *See Levinson,* 245 F.3d at 1328 (finding that administrative record was complete and that defendant had ample opportunity to obtain evidence to rebut plaintiff's evidence). Given that there are no disputed facts, Plaintiff is entitled to judgment as a matter of law. *Cf. Shaw v. Connecticut Gen. Life Ins. Co.,* 353 F.3d 1276, 1286–87 (11th Cir.2003) (reversing and remanding for bench trial due to sharply conflicting evidence on whether plaintiff was disabled). For all of the foregoing reasons it is

**ORDERED AND ADJUDGED** that Plaintiff, Eric Freling's Motion **(D.E.54)** is GRANTED and Defendant, Reliance Standard Life Insurance Company's Motion (D.E.55) is DENIED. Summary Judg-

ment is entered in favor of Plaintiff with respect to liability. As neither party addressed the issue of damages, Plaintiff shall file an appropriate motion regarding the issue of damages on or before **March 12, 2004.**

12. At oral argument, defense counsel stated that Reliance chose not to seek an independent examination because the article was sufficient.